Douglas A. HENSLEY, Jr., Respondent,

v.

**JACKSON COUNTY, Missouri,**
Appellant.

No. SC 88176.

Supreme Court of Missouri,
En Banc.

July 6, 2007.

---

Albert A. Riederer, Randell G. Collins, Kansas City, MO, for Appellant.

John C. Bragg, Independence, MO, for Respondent.

Zachary T. Cartwright, Jr., Missouri Highways & Transportation Com'n, Jefferson City, Galen Beaufort, Douglas McMillan, Office of City Atty., Kansas City, MO, for Amicus Curiae Missouri Highways & Transportation Com'n.

LAURA DENVIR STITH, Judge.

Jackson County appeals from a jury verdict of $150,000 in favor of plaintiff Douglas Hensley, Jr., on his claim that Jackson County's negligent failure to maintain or repair a downed stop sign caused an accident in which he sustained personal injuries. It argues that sovereign immunity should have barred suit against it. For the reasons set out herein, this Court holds that this suit for failure to maintain or repair a stop sign falls within the statutory waiver of sovereign immunity for injuries resulting from dangerous conditions of public property. Sec. 537.600.1(2), RSMo 2000. To the extent that *Donahue v. City of St. Louis*, 758 S.W.2d 50 (Mo. banc 1988), and its progeny suggest to the contrary, they are overruled. The judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

On Sunday, September 1, 2002, Douglas Hensley was injured when an automobile in which he was a passenger entered an intersection while heading northbound on Stillhouse Road in Jackson County and struck another automobile. Jackson County Department of Public Works ("Public Works") is charged with inspecting, repairing, and replacing traffic signs in Jackson County and regularly patrols the roads and reports damaged or downed signs. A Jackson County deputy investigated the accident scene and reported to Public Works that the stop sign that controlled northbound traffic on Stillhouse Road was not standing. The sign was not broken and did not appear to have been knocked down as a result of the accident.

Jackson County presented evidence that neither the investigating deputy nor em-

ployees of Public Works who patrol or drive through the intersection where the accident occurred noticed that the stop sign was down or leaning prior to the accident. Had they seen it down, these employees testified, they would have reported it to Public Works. Testimony further established that Public Works' policy is to repair or replace such stop signs within five hours after receiving a report. Two individuals who live near the intersection presented contrary evidence that the stop sign had been leaning at a forty-five degree angle for the entire month of August and had fallen completely down by the morning of Friday, August 30, 2002, two days before the accident.

Although the accident occurred over the Labor Day weekend while Public Works was closed, an employee was on call the entire holiday period to respond to emergency dispatches. Within thirty minutes of receiving the first report of the downed stop sign on Stillhouse Road, employees from Public Works erected a temporary sign, as they were unable to replace the original sign in its proper position.

Mr. Hensley brought suit against Jackson County. He claimed that the stop sign had been down for at least two days prior to the accident and that the accident was caused, in part, by Jackson County's negligent failure to maintain the stop sign, which resulted in a dangerous condition of public property. A jury returned a verdict of $150,000 in favor of Mr. Hensley. The trial court held that sovereign immunity did not apply. After opinion from the court of appeals, this Court granted transfer.

On appeal, Jackson County asserts that under *Donahue* and its progeny a plaintiff can sue a public entity for injuries allegedly caused by a downed stop sign only under a theory of defective design. *Donahue*, 758 S.W.2d 50. Because Mr. Hensley

alleged that the downed stop sign resulted from a failure to maintain the sign, rather than from defective design, Jackson County argues that he failed to come within the waiver of sovereign immunity set out in section 537.600.1 for dangerous conditions of public property and otherwise failed to prove the four elements necessary to show a waiver of sovereign immunity under that section.

## II. SOVEREIGN IMMUNITY FOR DANGEROUS CONDITIONS OF PUBLIC PROPERTY AND ITS EXCEPTIONS

### A. Non–Maintained Stop Signs can be Dangerous Conditions.

In *Jones v. State Highway Comm'n*, 557 S.W.2d 225 (Mo. banc 1977), this Court judicially abrogated common law sovereign immunity in tort. The following year, the legislature re-adopted sovereign immunity, with certain modifications, stating:

> Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that the immunity of a public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following circumstances . . .

Sec. 537.600.1. This provision then sets out two specific situations in which sovereign immunity is waived: where a public employee negligently operates a motor vehicle during the course of employment and thereby causes injury, sec. 537.600.1(1) (the "negligent driving" exception) and where the injury results from a dangerous condition of public property, sec. 537.600.1(2) (the "dangerous condition" exception). The latter exception stated in

relevant part that sovereign immunity was waived as to:

> Injuries caused by the condition of a public entity's property if the plaintiff establishes that he property was in a dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that ... a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

In 1985, the general assembly amended section 537.600.1(2) to provide an exception from the waiver of sovereign immunity for a dangerous condition caused by the defective design of a road or highway if the design or construction was in accordance with the state of the art as it existed prior to the re-adoption of sovereign immunity on September 12, 1977, stating:

> In any action under this subdivision *wherein a plaintiff alleges that he was damaged by the negligent, defective or dangerous design of a highway or road, which was designed and constructed prior to September 12, 1977,* the public entity shall be entitled to a defense which shall be a complete bar to recovery whenever the public entity can prove by a preponderance of the evidence that the alleged negligent, defective, or dangerous design reasonably complied with highway and road design standards generally accepted at the time the road or highway was designed and constructed.

Sec. 537.600.1(2), RSMo Supp.1985 (emphasis added).

The meaning of section 537.600.1(2) following the 1985 amendment was at issue in *Donahue,* which also involved an injury occurring at an intersection where a stop sign had been knocked down and not replaced. *Donahue* analyzed the case before it as if it were a negligent design case rather than a negligent maintenance case. 758 S.W.2d at 52. *Donahue* held that the 1985 amendment to section 537.600.1(2) newly waived sovereign immunity for such negligent designs and that the plaintiff there had made a submissible case on that negligent design theory. *Id.* at 52–53.

Although *Donahue* reached the correct result, it misread section 537.600.1(2) as enacted prior to the 1985 amendment. On its face, the 1978 version of section 537.600.1(2) allowed suits against public entities for dangerous conditions of public property where the other statutory requirements are also met. Nothing in its language suggested this liability did not extend to cases involving design defects in roads and other public property, in addition to other kinds of dangerous conditions of public property.

The 1985 amendment confirms that the statutory waiver of sovereign immunity extended to negligent, defective or dangerous design of a highway, for it provided an exception to that waiver for public highways designed and constructed prior to September 12, 1977, if the highway complied with the state of the art at the time it was designed and constructed. Id. This exception would have been unnecessary if the statute had not previously permitted recovery for negligent design.

■ Cases following *Donahue* have struggled to apply *Donahue's* negligent design analysis when dealing with stop sign or negligent maintenance cases, and understandably so.[1] This case, which also

---

1. *See, e.g., Fox v. City of St. Louis,* 823 S.W.2d 22, 24 (Mo.App. E.D.1991) (citing *Donahue*

for the proposition that claims regarding stop signs can only be brought under a defective

involves an allegation of the negligent maintenance or failure to repair a downed stop sign, is factually indistinguishable from *Donahue,* and this Court readily concludes that the negligent design analysis has no application to these facts. To the extent that *Donahue* or other cases suggest that the statutory provision making a "state of the art" defense available in certain negligent design cases has any effect on other types of "dangerous condition" cases, they are inconsistent with this opinion and should no longer be followed.

### B. A Submissible Case of Waiver of Sovereign Immunity was Made.

■ To benefit from the statutory waiver of sovereign immunity set out in section 537.600.1(2), Mr. Hensley was required to prove four elements:

(1) that the property was in dangerous condition at the time of the injury,

(2) that the injury directly resulted from the dangerous condition—that is, that the dangerous condition was the proximate cause of the injury, *see Stanley v. City of Independence,* 995 S.W.2d 485, 488 (Mo. banc 1999);

(3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and

(4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

■ Jackson County asserts that Mr. Hensley failed to make a submissible case on any of these four required elements. It notes that it presented evidence that the

direct cause of Mr. Hensley's injuries was the negligence of the person driving the car in which he was riding and Mr. Hensley's own negligence in failing to wear a seat belt. Jackson County presented evidence that Missouri law requires motorists at unregulated intersections to yield to the traffic coming from the right, sec. 304.351.2, RSMo 2000, and that the driver of Mr. Hensley's car may have been speeding. Therefore, the County argues, the car in which Mr. Hensley was riding should have yielded the right of way to the car that hit it.

■ Missouri law is clear, however, that a failure of the driver to yield "would be insufficient in and of itself to negate the [causation] element of the dangerous condition exception ... [to] the sovereign immunity defense." *Williams v. Mo. Hwy & Transp. Comm'n,* 16 S.W.3d 605, 612 (Mo. App. W.D.2000). "The negligence of the defendant need not be the sole cause of the injury, as long as it is one of the efficient causes thereof, without which injury would not have resulted." *Oldaker v. Peters,* 869 S.W.2d 94, 100 (Mo.App. W.D.1993).

Mr. Hensley presented substantial evidence that it was Jackson County's negligent maintenance of the stop sign that caused his injuries. This included the testimony of two nearby residents that the sign was down at the time of the accident and the testimony of two experienced employees of the Jackson County Department of Public Works itself, each of whom had worked for Jackson County for over 20 years, that a downed stop sign is a dangerous condition that can cause traffic accidents.

design theory); *Hedayati v. Helton,* 860 S.W.2d 795, 796–97 (Mo.App. W.D.1993) (affirming dismissal of petition on basis that under *Donahue* allegations of negligent or defective design or maintenance of a public road cannot constitute "dangerous conditions" within the meaning of section 537.600.1(2)).

These two Public Works department witnesses, as well as another Public Works employee who had been with the department for thirty-nine years, also testified that it is an issue of highest importance when a stop sign is down because an accident could happen and people could get injured and that downed stop signs were replaced within a few hours of receiving notice of them. In addition, the driver of the vehicle in which Mr. Hensley was a passenger testified that his practice was to slow down and stop when he saw a stop sign, that he did not see the stop sign, and that he did not slow down.

Mr. Hensley also presented testimony that would permit the jury to infer that Jackson County had constructive notice that the sign was down in sufficient time to repair or replace it prior to the accident. One witness testified that the stop sign had been leaning at a 45–degree angle for the entirety of August 2002, and two witnesses testified that the stop sign was completely down from the morning of Friday, August 30, 2002, through the time of the accident on the evening of Sunday, September 1, 2002. Other testimony established that vehicles from Public Works and the sheriff's department traversed the intersection regularly during the time the stop sign was leaning and down.

This evidence was sufficient to permit the jury to conclude that the stop sign was down at the time of the accident, that Jackson County had constructive notice that it had fallen down in time to repair or replace it before the accident, that it was reasonably foreseeable that the lack of a stop sign would create a dangerous condition, and that the fallen stop sign caused a dangerous condition and led to the accident. Jackson County notes that it presented contrary evidence that the stop sign did not fall until shortly before the accident and, had it been down earlier, it

would have been replaced immediately. But, because the jury found in favor of plaintiff, this Court disregards "evidence and inferences that conflict with th[e] verdict" in determining whether plaintiff made a submissible case. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456–57 (Mo. banc 2006). Mr. Hensley made a submissible case on each element needed to prove a dangerous condition of public property.

### III. INSTRUCTIONAL ERROR

Jackson County asserts that the trial court erred in failing to grant a new trial because the verdict director deviated from the applicable M.A.I. instruction, M.A.I. 31.16. The latter instruction is the approved verdict director for a case alleging waiver of sovereign immunity in cases involving a dangerous condition of public property. Its fourth paragraph states, "Fourth, as a direct result of such failure, plaintiff sustained damage." The instruction offered by plaintiff varied the language in Paragraph Fourth, so that it stated that the jury was to find that, "Fourth, such failure directly caused or directly contributed to cause Plaintiff to sustain damage."

Jackson County concedes it did not object to the verdict director, but suggests that it made objections in chambers that it had believed were on the record and that due to this confusion this Court should consider the issue as a matter of plain error.

Plain error is found only where the alleged error establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred. *State v. Baker*, 103 S.W.3d 711, 723 (Mo. banc 2003). "To establish that [an] instructional error rose to the level of plain error, appellant must demonstrate that the trial court so misdirected or failed to instruct

the jury that it is evident that the instructional error affected the jury's verdict." Id. Jackson County has failed to meet this standard. The transcript shows the following exchange occurred on the record:

> **Court:** All right. We need to conduct the instruction conference at this time. *I previously met with counsel off the record* ... I advised counsel *off the record* [as to the court's practice regarding photocopying instructions].
>
> Does the plaintiff have any objection to the form or substance of any of the instructions?
>
> **Plaintiff's Counsel:** No, I do not, Judge.
>
> **Court:** Does the Defendant?
>
> **Defense Counsel:** No, Your honor.
>
> **Court:** Does the plaintiff have any additional instructions he wishes to tender the Court claiming I should have given that instruction instead of the ones I'm going to?
>
> **Plaintiff's Counsel:** No, I do not, Judge.
>
> **Court:** Does the Defendant?
>
> **Defense Counsel:** No, Your Honor.

This exchange shows that counsel for Jackson County had been made aware that any conversations in chambers had been off the record, and, yet, specifically told the court that he had no objections to the instructions that were being given and had no alternative versions of instructions to offer. In addition, it offered a converse instruction that used language identical to that in the instruction to which it now objects. Jackson County waived any objection to the deviation from M.A.I. It has not demonstrated a manifest injustice or miscarriage of justice resulted from the variation in language used. *Gill Constr., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 724 (Mo.App. W.D.2004).

## IV. CONCLUSION

The judgment is affirmed.

All concur.