Christopher **SPIELVOGEL**, et al., Appellants,

v.

**CITY OF KANSAS CITY, Missouri,** Respondent.

**No. WD 70548.**

Missouri Court of Appeals, Western District.

Oct. 27, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 2009.

Application for Transfer Denied March 2, 2010.

---

Richard L. Rollings, Jr., Camdenton, MO, for Appellants.

Saskia C.M. Jacobse, Theodore T. Anderson, Kansas City, MO, for Respondent.

Before THOMAS H. NEWTON, C.J., JAMES EDWARD WELSH, and KAREN KING MITCHELL, JJ.

JAMES EDWARD WELSH, Judge.

Christopher Spielvogel and his wife, Diana Spielvogel, were riding a motorcycle on Highway 169 at the Broadway Bridge Complex in Kansas City on July 22, 2001, when their motorcycle collided with the center median. Both of them were ejected from the motorcycle. Diana Spielvogel died from her injuries, and Christopher Spielvogel was seriously injured. Christopher Spielvogel and his children, Brandon, Andrea, and Danielle Spielvogel, by and through their next friend, Catherine Spielvogel, sued the Missouri Highway and Transportation Commission (MHTC) and the City of Kansas City for personal injury and wrongful death.

The circuit court entered judgment against MHTC on the basis of an arbitration award, which found that MHTC was responsible for the property on which the accident occurred, that dangerous conditions existed on the property, and that the accident was a direct result of those dangerous conditions. The court then granted the City's motion for summary judgment, after finding that the City did not own the property at the time of the accident and that MHTC exclusively controlled the property. The Spielvogels appeal, claiming that the City failed to establish that it did not own the property at the time of the accident. We affirm.

When considering appeals from summary judgments, we review the record in the light most favorable to the party against whom judgment was entered, and we afford that party the benefit of all

reasonable inferences. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The record established that, in 1989, the City entered into an exchange agreement with MHTC. Pursuant to the agreement, the City agreed to give a portion of Highway 169, commonly known as the "Broadway Bridge Complex," to MHTC in exchange for a portion of Missouri State Highway AA in Platte County. The parties agreed that the exchange would not be complete until all of the agreement's terms, which included the City's making several repairs on the bridge complex, were satisfied.

On July 14, 1994, the City executed a bill of sale and a quitclaim deed deeding the bridge complex to MHTC. The City gave the deed to MHTC sometime after its execution but before January 26, 2001. MHTC took exclusive control of the Broadway Bridge Complex on August 8, 1994. MHTC has maintained exclusive control of it since that date.[1]

On June 8, 1995, the parties entered into an amendment to the exchange agreement. The amendment noted that the planned exchange had "progressed to the point where the transaction may be closed" but that certain terms in the exchange agreement needed to be modified to permit the City to convey the bridge complex. The first modified term was that the City would be required to retire any bonds on the Broadway Bridge Complex before it was conveyed to MHTC. The next modified term stated that, after the City completed the repairs that were required by the exchange agreement, the City would "provide the Broadway Bridge Complex to [MHTC] for its exclusive use (exclusive use shall include any and all ownership rights to bridge and roadway except rights

to transfer bridge and roadway) subject to all regulations and limitations on use that apply to other highway right of way and properties." The amendment stated that the City had the option of conveying the Broadway Bridge Complex to MHTC "at any time no later than ten years after the execution of this contract amendment." Finally, the amendment stated that MHTC agreed to "accept conveyance by the City under this agreement and maintain such property without cost to the City starting when it is provided to [MHTC] for its exclusive use."

On October 15, 1999, the bonds on the bridge complex were fully defeased. The bonds matured on October 15, 2000. Sometime between October 2000 and January 26, 2001, the City notified MHTC that the bonds had matured. On January 26, 2001, after receiving the City's notification that the bonds had matured, MHTC sent the deed to the City to be recorded by a City employee. The Spielvogels' accident occurred on July 22, 2001. The deed was recorded on July 27, 2001.

In the Spielvogels' subsequent wrongful death and personal injury suit, they alleged that, at the time of the accident, the Broadway Bridge Complex was the property of both the City and MHTC and that defective conditions on the bridge complex caused the accident. They claimed that the City and MHTC had actual or constructive notice of the defective conditions in sufficient time to take protective measures against them. They also claimed that the defective conditions were created by negligent or wrongful acts or omissions of the City's and MHTC's employees.

Upon the Spielvogels' request, the court ordered an arbitration hearing on their claims against MHTC. The arbitrators de-

1. The quit claim deed reserved certain easements and interests in the City. The reserved easements and interests are not at issue in this case.

termined that MHTC was responsible for the property on which the accident occurred and that MHTC had waived its right to sovereign immunity based upon the dangerous conditions on the property. The arbitrators found that MHTC was liable for Christopher Spielvogel's injuries and Diana Spielvogel's death. The arbitrators awarded Christopher Spielvogel damages of $861,000 on his personal injury claim, subject to a thirty percent reduction for his comparative fault. The arbitrators awarded the Spielvogels $2,250,000 in damages on their claim for the wrongful death of Diana Spielvogel. The court entered judgment against MHTC based upon the arbitration award.

The City subsequently moved for summary judgment on the Spielvogels' claims against it. The circuit court granted the City's motion, after finding that the City neither owned nor had exclusive control over the Broadway Bridge Complex. The Spielvogels appeal.

Our review of summary judgment is essentially *de novo*. *Id.* "The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id.* Summary judgment is proper only if "the motion, the response, [and] the reply ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6).

█ Generally, sovereign immunity protects a public entity against lawsuits without the public entity's consent. *Phelps v. City of Kansas City*, 272 S.W.3d 918, 920 (Mo.App.2009). However, section 537.600.1(2), RSMo 2000, waives sovereign immunity for injuries that result from a dangerous condition on the public entity's property. *Jones v. St. Charles County*,

181 S.W.3d 197, 203 (Mo.App.2005). To benefit from the waiver of sovereign immunity under section 537.600.1(2), a plaintiff must prove:

(1) that the property was in dangerous condition at the time of the injury[;]

(2) that the injury directly resulted from the dangerous condition—that is, that the dangerous condition was the proximate cause of the injury[;]

(3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and

(4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

*Hensley v. Jackson County*, 227 S.W.3d 491, 496 (Mo. banc 2007) (citation omitted). The "threshold question" that must be answered before considering whether any of these elements have been reached is whether, at the time of the alleged injury, the public entity actually owned the property or had exclusive possession and control over the property which rose to the level of an ownership interest. *Thomas v. Clay County Election Bd.*, 261 S.W.3d 574, 578–80 (Mo.App.2008).

█ In this case, it is undisputed that the City executed a bill of sale and quitclaim deed deeding the Broadway Bridge Complex to MHTC in 1994. It is also undisputed that the City transferred physical possession of the deed to MHTC sometime before January 26, 2001. Nevertheless, the Spielvogels contend that the City did not truly deliver the deed, with the intent to convey ownership of the property, until it had the deed recorded on July 27, 2001.

█ For a deed to operate as a transfer of the ownership of land, it must be

delivered. *Rhodes v. Hunt,* 913 S.W.2d 894, 900 (Mo.App.1995). Delivery of the deed "gives the instrument force and effect." *Id.* "Delivery signifies that all dominion and control over the deed is passed from the grantor to the grantee, or to someone for him, with the intention of transferring the present ownership of land, or an interest or estate therein." *Id.*

■■■ Whether a deed was delivered is a mixed question of law and fact. *Meadows v. Brich,* 606 S.W.2d 258, 260 (Mo.App.1980). Although recording a deed does create a presumption of delivery, recording does not, in itself, operate as delivery of the deed. *Greuter v. Wetekamp,* 172 S.W.3d 822, 825 (Mo.App.2005). Rather, the controlling element in determining whether a deed was delivered is the intent of the parties and, particularly, the grantor. *Id.* "The vital inquiry is whether the grantor intended a complete transfer—whether the grantor *parted with dominion over the instrument* with the intention of relinquishing *all* dominion over it and of making it presently operative as a conveyance of the title to the land." *Meadows,* 606 S.W.2d at 260. The parties' intent "may be manifested by words or acts or both." *Id.*

When the City gave the deed to MHTC sometime after executing it in 1994, the parties intended that MHTC would hold the deed, without recording it, until the terms of the amendment to the exchange agreement had been satisfied. The amendment to the exchange agreement provided that the City had to retire the bonds on the Broadway Bridge Complex before conveying the complex to MHTC. Thus, until the bonds were retired, the City could not transfer actual title to the complex to MHTC.

When the bonds matured in October 2000, the City notified MHTC. Upon receiving the City's notice that the bonds had matured, MHTC sent the deed to the City to be recorded. The City's act of notifying MHTC of the bonds' maturing manifested the City's intent to relinquish its remaining dominion over the deed and make it operative as a conveyance of title to the bridge complex. At that point, delivery of the deed occurred. MHTC's subsequent act of sending the deed to the City to be recorded manifested its intent to accept the delivery. That the deed was not recorded until later is of no consequence. Title to the property was transferred to MHTC on January 26, 2001.

■■■ The undisputed evidence conclusively establishes that MHTC, not the City, owned the Broadway Bridge Complex on July 22, 2001, the date of the Spielvogels' accident. Furthermore, the Spielvogels admit that MHTC had exclusive control, possession, and the responsibility to maintain the bridge complex on that date.[2] Hence, the property on which the Spielvogels' accident occurred was neither the City's property nor under the City's exclusive possession or control. As a matter of law, the City did not waive its sovereign immunity and cannot be held

**2.** Because MHTC had exclusive control and possession of the property at the time of the accident, it is questionable whether the City could be held liable even if it did own the property. "A public entity cannot be subject to suit for a dangerous condition which exists on property under the control of another public entity." *Ford v. Cedar County,* 216 S.W.3d 167, 171 (Mo.App.2006) (finding that a county was not subject to suit for alleged dangerous conditions on a county road because a special road district had taken responsibility for the road). *See also Dorlon v. City of Springfield,* 843 S.W.2d 934, 938–39 (Mo.App.1992) (stating that, where the waiver of sovereign immunity is based upon allegations that the public entity failed to take necessary measures to correct a dangerous condition, the "public entity must control the property in order to take appropriate actions").

liable for any dangerous conditions on the property. We, therefore, affirm the circuit court's granting summary judgment in favor of the City on the Spielvogels' claims for personal injury and wrongful death.

All concur.