Angela **PHELPS**, et al., Appellants,

v.

**CITY OF KANSAS CITY**, Missouri, Respondent.

No. WD 74287.

Missouri Court of Appeals, Western District.

May 29, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 2012.

Application for Transfer Denied Aug. 14, 2012.

Charles R. Dickman, Kansas City, MO, for appellants.

Douglas McMillan, Kansas City, MO, for respondent.

Before Division Three: THOMAS H. NEWTON, Presiding Judge, JAMES M. SMART, JR., Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

Angela Phelps and Lynn Dill appeal the judgment of the circuit court that granted the City of Kansas City, Missouri's motion to dismiss the cause of action on the pleadings. For the reasons explained below, we reverse and remand.

## Factual Background

Christopher Dill, ten years old, tragically died while walking in a field adjacent to a street near his school on a rainy day on May 30, 2007. He fell into a ditch filled with running water and was sucked into a drainage pipe, where he drowned despite the efforts of volunteers and emergency responders. His parents, Angela Phelps and Lynn Dill,[1] brought suit against the City of Kansas City (the "City") and the North Kansas City School District (the "District") on August 8, 2007 in Clay County Circuit Court, alleging negligence in the maintenance or operation of the drainage system and that the condition of the property constituted a dangerous condition.

The City moved to dismiss for failure to state a claim under Rule 55.27[2], contending that Phelps had failed to plead the necessary elements to support waiver of the City's sovereign immunity. Specifically, the motion stated that the drainage ditch was owned by the District and not the City, and claimed that ownership of the property is essential to implicate any waiver of sovereign immunity. The trial court granted the City's motion to dismiss on February 8, 2008.

Phelps appealed and this Court reversed and remanded the trial court's judgment on the basis that the City was not entitled to sovereign immunity. *Phelps v. City of Kansas City*, 272 S.W.3d 918 (Mo.App. W.D.2009).

On remand, Phelps filed their Third Amended Petition, which, *inter alia*, did not name the District as a defendant in light of the fact that Phelps and the District had entered into a settlement. Sub-

---

1. For ease of analysis, we will refer to the plaintiffs collectively simply as "Phelps" hereinafter.

2. Unless otherwise indicated, all rule references are to the Missouri Court Rules (2011).

sequently, on September 23, 2010, the City once again filed a motion to dismiss Phelps' lawsuit on the basis of sovereign immunity. On July 27, 2011, the trial court again granted the City's motion to dismiss under Rule 55.27.

Once again, Phelps appeals the judgment of the trial court; once again, we reverse and remand.

Further facts regarding this lawsuit are outlined as necessary in the analysis section below.

## Standard of Review

■■■■ "We review *de novo* the grant of a motion to dismiss, examining the pleadings to determine whether they invoke principles of substantive law." *Weems v. Montgomery*, 126 S.W.3d 479, 484 (Mo. App. W.D.2004). "The pleadings are liberally construed and all alleged facts are accepted as true and construed in a light most favorable to the pleader." *Id.* (internal quotation marks omitted). "In making our determination, we may not address the merits of the case or consider evidence outside the pleadings." *Id.* (internal quotation marks omitted). "If the petition sets forth any set of facts that, if proven, would entitle the plaintiffs to relief, then the petition states a claim." *Adams v. One Park Place Investors, LLC*, 315 S.W.3d 742, 753 (Mo.App. W.D.2010).

## Analysis

On appeal, Phelps argues in each of her three Points Relied On that the "trial court erred in granting the City's Motion to Dismiss for failure to state a claim upon which relief may be granted on sovereign immunity grounds." [3]

We begin our analysis with Phelps' second Point on appeal. Here, the trial court dismissed Phelps' Third Amended Petition on the basis that plaintiffs' claims "are barred by the doctrine of Sovereign Immunity, and the Court further finds there has been no waiver of that doctrine, pursuant to Section 537.610." [4]

■■■■ "Under the doctrine of sovereign immunity, public entities are immune from suit for their negligent acts unless the General Assembly has expressly waived such immunity." *Kraus v. Hy–Vee, Inc.*, 147 S.W.3d 907, 914 (Mo.App. W.D.2004) (citing Section 537.600.1). " 'A municipality has sovereign immunity from actions at common law tort in all but four cases: (1) where a plaintiff's injury arises from a public employee's negligent operation of a motor vehicle in the course of his employment (section 537.600.1(1)); (2) where the injury is caused by the dangerous condition of the municipality's property (section 537.600.1(2)); (3) where the injury is caused by the municipality performing a proprietary function as opposed to a governmental function; and (4) to the extent the municipality has procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy (section 537.610).' " *Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 206 (Mo.App. W.D.2011) (quoting *Bennartz v. City of Columbia*, 300 S.W.3d 251, 259 (Mo.App. W.D.2009)).

---

3. Because of our disposition of Points two and three raised by Phelps before us, we need not reach the merits of Phelps' first Point Relied On.

4. All statutory citations are to RSMo 2000 as updated through the 2011 Cumulative Supplement, unless otherwise indicated.

Based on the subject matter involved in the motion to dismiss filed by the City, we presume the trial court meant to refer to section 537.600 (which pertains to sovereign immunity) instead of section 537.610 (which pertains to "[l]iability insurance for tort claims may be purchased by whom . . .").

■ On appeal, Phelps contends that two such exceptions apply herein, and that therefore the City is *not* immune from the instant lawsuit. "A party pleading an exception to a general rule of non-liability must plead the facts giving rise to the exception." *Thomas v. City of Kansas City*, 92 S.W.3d 92, 101 (Mo.App. W.D. 2002). "Accordingly, to state a cause of action sufficient to survive a motion to dismiss on the pleadings, the petition, when viewed in its most favorable light, must plead facts, which if taken as true, establish an exception to the rule of sovereign immunity." *Id.*

Phelps asserts that the "trial court erred in granting the City's Motion to Dismiss for failure to state a claim upon which relief may be granted on sovereign immunity grounds because under well-established Missouri common law, sovereign immunity shall not shield the municipality in the performance of a proprietary act in that (1) the City's operation and maintenance of a fee-for-use storm water drainage system benefits the City in its corporate capacity; and (2) Christopher drowned as a result of the design and maintenance of the City's fee-for-use storm water drainage system."

■ The City does not dispute that, pursuant to Missouri law, the City does not enjoy sovereign immunity if its conduct in question constituted a "proprietary function" rather than a "governmental function." "A municipality has sovereign immunity from actions at common law tort 'for those actions they undertake as a part of the municipality's governmental functions-actions benefiting the general public.'" *Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 205 (Mo.App. W.D.2011) (quoting *Kunzie v. City of Olivette*, 184 S.W.3d 570, 574 (Mo. banc 2006)). "However, '[m]unicipalities have no immunity for torts while performing proprietary functions-ac-tions benefiting or profiting the municipality in its corporate capacity.'" *Id.*

■ Here, Phelps, in her Third Amended Petition, pleads facts that "the City's negligent operation of its storm water drainage system" caused the child to drown, and that "the City operated the storm water drainage system for a fee and as a proprietary function." *Id.* at 3; 6. Missouri law is clear that "by pleading that the injuries were caused by city-constructed drainage systems, [plaintiff] pleaded facts showing an exception to sovereign immunity because the operation of municipal drainage systems is, as a matter of law, a proprietary function." *Thomas v. City of Kansas City*, 92 S.W.3d 92, 101 (Mo. App. W.D.2002); *see also St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.*, 589 S.W.2d 260, 266–67 (Mo. banc 1979) (concluding that tort liability applies to municipalities "in the case of construction of storm sewers" and in "sanitary sewers" because "this court has never recognized a distinction between construction of the two types of sewers" ... "The type of activity is the same in both cases, and the same rule should apply .... den[ying] immunity to municipal corporations for acts performed in the construction of sewers on the basis that in so acting they are performing a proprietary rather than a governmental function.").

Here, Phelps' Third Amended Petition alleged in detail how the City "operates the storm water drainage system, which includes the Ditch, Inlet Pipe and Outlet Pipes, for a fee as a proprietary function." *Id.* at 7. Phelps also alleged that on the day in question that the child was walking down the City's street (NE 52nd Street), and that the child was then, due to the street's improper design required to walk onto the Maplewood Elementary School's field "[b]ecause NE 52nd Street has no sidewalk, shoulder, curb, or any other pe-

destrian feature on either side of the street and has sharply sloping edges." *Id.* at 2. The Petition further alleged the following:

> While crossing the field, Christopher slipped into a flooded storm drainage ditch ... At the time Christopher was crossing the School's field, the Ditch and the area surrounding the Inlet Pipe were flooded with storm water and run-off and after slipping into the Ditch, Christopher's leg was sucked into the Inlet Pipe. Because of the water current and resulting suction around the Inlet Pipe, as well as the single bar located across the Inlet Pipe and despite the efforts of several people, Christopher's body became submerged in the water. After several minutes of fighting for his life, Christopher drowned.

Third Amended Petition, pg. 2–3.

The Petition went on to allege in detail the Kansas City Municipal Ordinances that required the City to plan and construct storm sewers, and further how the ordinances provided that the "owner of each parcel of land within the city shall be responsible for payment of the stormwater fee." *Id.* at 7–8 (quoting Kansas City Ordinance 61–1 and 61–3). The Petition further alleged that

> [t]hrough the above city ordinances, the City has the power, ability and obligation to:
>
> a. Plan, design, construct, repair, correct, improve, maintain and operate the storm water drainage system, including the Ditch, Inlet Pipe and Outlet Pipes, in a reasonable manner so as to satisfy its stated duty of protecting, preserving and promoting the public health, safety and welfare of the citizens of the City;
>
> b. Assess a stormwater fee again every property owner within the City limits, including but not limited to the School District, to pay for the planning, design, construction, reconstruction, improvement, replacement, maintenance, and operation of a safe storm water drainage system; and
>
> c. Approve, disapprove, correct, repair and/or remove modifications, improvements, and changes made by landowners to the storm water drainage system.

Third Amended Petition, pg. 9.

Finally, the Petition alleged that

In the area of the Ditch, Inlet Pipe and Outlet Pipes, the City was negligent and breached its duty to operate and maintain the storm water drainage system in a manner which protected, preserved and promoted the public health, safety, and welfare of the citizens of the City in the following respects:

a. By creating or allowing to exist a dangerous condition within the storm water drainage system;

b. By creating or allowing the Inlet Pipe to exist in a dangerous condition;

c. By failing to barricade the Inlet Pipe;

d. By failing to warn Christopher and other pedestrians of the dangerous condition of the Inlet Pipe and the area around the Inlet pipe;

e. By failing to remedy, repair or replace the Inlet Pipe;

f. By installing and/or repairing, or having installed and/or repaired at its direction, the Outlet Pipes upstream from the Inlet Pipe which increased the storm water flow into the Inlet Pipe and created or worsened the dangerous condition of the Inlet Pipe;  and

g. By failing to install appropriate storm sewer features in the area where Christopher drowned.

Third Amended Petition, pg. 10.

In the face of these averments in the Third Amended Petition that specifically allege the City's "proprietary function" caused the death of the child, the City makes numerous arguments that must be rejected. For example, the City argues on appeal that the "Third Amended Petition contains no allegations concerning control or possession by the City of the inlet pipe." To the contrary, the Petition alleged in detail how pursuant to the City's own ordinances, that it has the "power, ability, and obligation to ... [p]lan, design, construct, repair, correct, improve, maintain and operate the storm water drainage system, including ... [the] Inlet Pipe."

The City further argues that "[t]here is no allegation that the City designed or built the location where Dill drowned." That is also inaccurate. The Petition alleged that the City "creat[ed] ... a dangerous condition within the storm water drainage system," and that the City "creat[ed] or allow[ed] the Inlet Pipe to exist in a dangerous condition." The Petition further alleged that the City "install[ed] ... the Outlet Pipes upstream from the Inlet Pipe which increased the storm water flow into the Inlet Pipe and created and worsened the dangerous condition of the Inlet Pipe." *Id.* Based on these averments, which must be taken as true pursuant to our applicable standard of review, Phelps alleged that "the City designed or built the location where Dill drowned" in light of the fact that it was pled by Phelps that the City installed and created the above conditions which led to the child's death.

The City also argues that Phelps "cannot properly allege that the City owned, possessed or controlled this location ... because the location where Dill drowned is School District property." But the City has failed to cite any authority holding that when the City is engaging in a proprietary function that leads to "injuries ... caused by city-constructed drainage systems," that a plaintiff must also plead and prove that the land the drainage system is built upon is *also* owned by the City. *Thomas*, 92 S.W.3d at 101. To the contrary, this Court has held that "[b]y pleading that the injuries were caused by city-*constructed* drainage systems, [plaintiff] pleaded facts showing an exception to sovereign immunity because the *operation* of municipal drainage systems is, as a matter of law, a proprietary function." *Id.* (emphasis added).[5]

---

5. The City cites to the Missouri Supreme Court's holding in *State ex rel. Div. of Motor Carrier and R.R. Safety v. Russell* for the following proposition: "In order for property to be considered that of the sovereign for the purpose of waiver immunity under section 537.900.2, the sovereign must have the exclusive control and possession of that property." 91 S.W.3d 612, 616 (Mo. banc 2002). But as recognized by the City, that case and holding dealt exclusively with the "dangerous condition waiver," which is a distinct and different issue than the one we analyze in this Point. *Id.*

Because of our disposition of Point Two, we need not reach the issue of the property rights pertaining to the land on which the drainage system was built. However, we note, without further elaboration, that the Missouri Supreme Court has held the following as it pertains to sewage systems (which the Court also held were indistinguishable from drainage systems): "Sewer construction falls into the [proprietary function] category because a city so acts in its capacity as a private corporation for the benefit of its residents, and *the sewer constructed becomes its property.*" *St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.*, 589 S.W.2d 260, 267 (Mo. banc 1979) (emphasis added).

The City attempts to distinguish *Thomas* by arguing that *Thomas* "involved property damage caused by water from both drainage systems owned by both Raytown and Kansas City to plaintiff's home. In this case, the inlet on School's property caused the loss." We fail to ascertain any meaningful distinction between *Thomas* and the instant case because in *Thomas* the plaintiffs alleged:

> that public "sewer and drainage systems" were causing ground water and sewer water to flood their property and residence. They alleged that each city owned a "portion" of the sewer and drainage system. They assert that in October 1998, they notified the City of Raytown that its failure to clean up the drainage ditch (of trees the City of Raytown had cut down) blocked the flow of water. They also allege "there were problems" with the design of the sewage system on the "Raytown side of the sewer line." They allege that the City of Raytown was negligent in the design, construction, and maintenance of its sewer and storm drainage system.... They claimed that, as a result, a dangerous condition exists in the sewer and storm drainage system owned and operated by the City of Kansas City. They alleged also that the ditch "as maintained by the Defendant City of Raytown" was defective and dangerous as a result of debris that the City of Raytown failed to clean up. They allege damages, including damage to personal property and personal injuries, including sickness.

92 S.W.3d at 95.

In the instant case, the allegations contained in Phelps' Petition are strikingly similar in that the construction and maintenance of the drainage system is the conduct that is alleged to have caused the damages in question in both cases. Here, the City fails to grasp the gravity of the averments in Phelps' Petition when the City argues on appeal "that the 'storm water drainage system' did not cause Dill's death—the bar across the inlet pipe caused the death." But as alleged by Phelps in detail in their Petition (which must be liberally construed by this Court), the Inlet Pipe was part and parcel of the drainage system that was created, operated, and controlled by the City. When the petition alleges that the death was caused by faulty design and construction of the storm water drainage system and the City admits that the death was caused by that storm water drainage system, we must conclude that the trial court erred in holding that the City was immune to suit while engaging in this "proprietary function."

Point Two is granted.

In Point Three, Phelps argues that the trial court also erred "in granting the City's motion to dismiss for failure to state a claim upon which relief can be granted on sovereign immunity grounds because under Section 537.600.1, sovereign immunity shall not shield the sovereign from liability for injuries caused by a dangerous condition of a public entity's property in that (1) owning the property where injury occurred in fee simple absolute is not a requirement for a Section 537.600.1(2) waiver of sovereign immunity; (2) the City had a prescriptive easement where Christopher drowned; and (3) to constitute a public entity's property for purposes of Section 537.600.1(2), exclusive control or possession of the property where injury occurred is not required."

As previously stated above, "[a] party pleading an exception to a general rule of non-liability must plead the facts giving rise to the exception," therefore, "to state a cause of action sufficient to survive a motion to dismiss on the pleadings, the petition, when viewed in its most favorable

light, must plead facts, which if taken as true, establish an exception to the rule of sovereign immunity." *Thomas,* 92 S.W.3d at 101.

Here, the issue is whether the petition plead sufficient facts to support a cause of action that the child's death was caused by the "dangerous condition" of the municipality's property, thereby waiving the City's immunity pursuant to Section 537.600.1(2). We conclude that the petition contained a sufficient factual basis, and that therefore the trial court erred in finding that the City was immune from suit because the City waived its immunity pursuant to this distinct and different legal basis than the argument raised in Point Two.

In *Thomas v. Clay County Election Board,* this Court outlined the following applicable law in this regard:

> To benefit from the statutory waiver of sovereign immunity set out in section 537.600.1(2), a plaintiff is required to prove the following four elements:
>
> (1) that the property was in dangerous condition at the time of the injury,
>
> (2) that the injury directly resulted from the dangerous condition-that is, that the dangerous condition was the proximate cause of the injury, *see Stanley v. City of Independence,* 995 S.W.2d 485, 488 (Mo. banc 1999);
>
> (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and
>
> (4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> *Hensley v. Jackson County,* 227 S.W.3d 491, 496 (Mo. banc 2007). A threshold question must be answered before the

matter of whether these four elements have been established is reached, though. The threshold question is whether the property in an allegedly dangerous condition belongs to the sovereign. *Summitt by Boyd v. Roberts,* 903 S.W.2d 631, 635 (Mo.App. W.D. 1995). If not, the topic of sovereign immunity is never reached. This threshold question is the issue in the case *sub judice.*

261 S.W.3d 574, 577–78 (Mo.App. W.D. 2008).

" 'In order for property to be considered that of the sovereign for the purpose of waiver immunity under section 537.900.2, the sovereign must have the exclusive control and possession of that property.' " *Thomas,* 261 S.W.3d at 580 (quoting *State ex rel. Div. of Motor Carrier and R.R. Safety v. Russell,* 91 S.W.3d 612, 616 (Mo. banc 2002)).

Here, the City contends that the property in question "where the injury occurred is owned in fee simple absolute by the School District." But this argument ignores our specific analysis in *Thomas,* which explained in detail how the issue of sovereign immunity has a unique analysis over traditional notions of "property" ownership. Specifically, as will be explained below, our holding in *Thomas* expressly rejected the notion that fee simple absolute ownership of the property in question by a third party necessarily absolves the City of liability.

In *Thomas,* the plaintiff sued the Election Board after she fell and was injured on a Church's driveway while walking into the Church in order to vote on Election Day. *Id.* at 575. The trial court dismissed the Petition based on its conclusion that the "accident occurred in the church parking lot in an area which the public entity did not exercise possession and control and was therefore not the public entity's 'prop-

erty' as required by the Missouri Statute (section 537.600.1(2))." *Id.* at 576. In reversing and remanding, this Court relied heavily upon our precedent in *James v. Farrington,* 844 S.W.2d 517 (Mo.App. W.D.1992), to conclude the following:

> *James* stands for a broad, inclusive definition of "public entity's property" as opposed to the narrow, exclusive definition used by the trial court. The issue in *James* was "whether a church that *rented* space to an election board as a polling place constitutes a public entity's property." *Id.* at 518. More specifically, the issue in *James* was "whether the polling place in the church used by the Board constitutes a 'public entity's property' thereby triggering a waiver of sovereign immunity pursuant to § 537.600.1(2)." *Id.* at 517. The court stated: "Resolution of the issue depends on whether property **which is possessed and occupied, but not owned by a public entity,** is a 'public entity's property' within the purview of § 537.600.1(2)." *Id.*

*Thomas,* 261 S.W.3d at 578 (emphasis added).

Critically, in *Thomas,* we concluded that "*James* broadened the definition of 'property' for purposes of the sovereign immunity statute." *Id.* at 579. "It held that 'possession and control of premises during the election **constituted 'property'** and *it was not necessary the Board have ownership of the property to constitute a waiver of sovereign immunity.*'" *Id.* (quoting *James* 844 S.W.2d at 520) (emphasis added). Rather, "[t]he appropriate question [and test] is whether the Board exercised possession and control **rising to the level of an ownership interest** over the area where Ms. Thomas fell, wherever that may be." *Id.* at 580 (emphasis added).

The Petition in the case at bar sets forth two separate dangerous conditions of property that are alleged have caused or contributed to cause the child's death and that are alleged to be owned and controlled by the City. First, the Petition alleges that the city street (NE 52nd Street) was defectively designed such that it had "no sidewalk, shoulders, curb, or any other pedestrian feature on either side of the street and had sharply sloping edges" forcing pedestrians to have to walk into the field where the allegedly defective drainage system is located. It is further alleged that this dangerously designed street is located near a school where children could foreseeably be walking to and from the school. The Petition further alleges that the City owned the storm water drainage system and as is set forth in more detail above, that it also constituted a dangerous condition of property. Applying the test set forth in *Thomas* to the instant case, we must conclude that Phelps' Third Petition set forth sufficient averments that the City did have "possession and control" over the dangerous properties which ultimately caused the child's death such that, if proven, could establish the City's interest rose "to the level of an ownership interest." *Thomas,* 261 S.W.3d at 580.

As outlined above, Phelps' Third Amended Petition alleged that

> [t]hrough the above city ordinances, the City has the power, ability and obligation to:
>
> a. Plan, design, construct, repair, correct, improve, maintain and operate the storm water drainage system, including the Ditch, Inlet Pipe and Outlet Pipes, in a reasonable manner so as to satisfy its stated duty of protecting, preserving and promoting the public health, safety and welfare of the citizens of the City;

\* \*

c. Approve, disapprove, correct, repair and/or remove modifications, improvements, and changes made by landowners to the storm water drainage system.

Third Amended Petition, pg. 9.

In the area of the Ditch, Inlet Pipe and Outlet Pipes, the City was negligent and breached its duty to operate and maintain the storm water drainage system in a manner which protected, preserved and promoted the public health, safety, and welfare of the citizens of the City in the following respects:

a. By creating or allowing to exist a dangerous condition within the storm water drainage system;

b. By creating or allowing the Inlet Pipe to exist in a dangerous condition;

c. By failing to barricade the Inlet Pipe;

d. By failing to warn Christopher and other pedestrians of the dangerous condition of the Inlet Pipe and the area around the Inlet pipe;

e. By failing to remedy, repair or replace the Inlet Pipe;

f. By installing and/or repairing, or having installed and/or repaired at its direction, the Outlet Pipes upstream from the Inlet Pipe which increased the storm water flow into the Inlet Pipe and created or worsened the dangerous condition of the Inlet Pipe; and

g. By failing to install appropriate storm sewer features in the area where Christopher drowned.

Third Amended Petition, pg. 10.

It will be the obligation of Phelps to prove each and every element of the cause of action and to adduce proof that the City did exercise sufficient control over the property to meet the test under *Thomas*; however, the issue before us today is not whether Phelps can meet its burden of proof, but merely whether the petition states a cause of action.

The Petition also alleges that the "City's use of the Ditch and Inlet Pipe to drain the City's stormwater draining from the 15 Inch Pipe as described in this Count constitutes a prescriptive easement," and, accordingly, "the City had the obligation to maintain and repair the prescriptive easement so that [it] would be in a reasonably safe condition and not dangerous for third parties such as Christopher." The City disputes whether its interest in the property constituted a "prescriptive easement," but we do not believe that resolving that issue is necessary to dispose of the narrow issue before this Court today.[6] Rather, case law makes clear that in the specific context of determining whether immunity exists pursuant to Section 537.600.1(2), we must only resolve whether Phelps' Petition averred facts that the City "exercised possession and control *rising to the level of an ownership interest*" over the area in question. *Id.* at 580 (emphasis added).

---

6. Phelps alleged that the City had a "prescriptive easement" over the drainage ditch in the first count of its Third Amended Petition. The parties dispute whether one political subdivision may obtain a prescriptive easement against another political subdivision and if so, whether the City in this case did in fact have a prescriptive easement over the property in question. However, Phelps' Third Amended Petition, as pled, outlined the essential facts which if proven could establish the City's control and possession of the alleged dangerous property in order to state a claim for a waiver of immunity theory pursuant to Section 537.600.1(2), even absent the allegation of a prescriptive easement. Therefore, if a prescriptive easement is not established at trial it would not be fatal to the cause of action as pled.

Here, taking Phelps' pleaded averments as true, as we must, we conclude that the Petition does in fact state a cause of action alleging that the City had possession and control over the street, the drainage pipes and the drainage ditch in question sufficient to meet the requirements of *Thomas.* "If the petition sets forth any set of facts that, if proven, would entitle the plaintiffs to relief, then the petition states a claim." *Adams,* 315 S.W.3d at 753.

On appeal, the City cites to a plethora of case law that is distinguishable in that the cases cited do not deal with this issue within the relevant framework of the immunity analysis pursuant to Section 537.600.1(2). Our cases hold that "a broad, inclusive definition of 'public entity's property'" was intended in light of the fact that it has "broadened the definition of 'property' for purposes of the sovereign immunity statute." *Thomas,* 261 S.W.3d at 578–79.

Here, pursuant to our standard of review in considering a trial court's grant of a motion to dismiss, we conclude that the Court erred in dismissing Phelps' Petition under the City's sovereign immunity pursuant to Section 537.600.1(2).

### Conclusion

The judgment of the circuit court, granting the City's motion to dismiss, is hereby reversed and remanded.

All concur.